**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GIANT EAGLE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 2:26-cv-01319 |
| | ) |
| AON RISK SERVICES CENTRAL, INC. | ) JURY TRIAL DEMANDED |
| and AON FINANCIAL SERVICES | ) |
| GROUP, INC. | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

For its complaint against Defendants Aon Risk Services Central, Inc. and Aon Financial Services Group, Inc. (collectively, "Aon"), Plaintiff Giant Eagle, Inc. ("Giant Eagle") alleges as follows:

## I.      INTRODUCTION

1.      Touting itself as one of the most experienced and knowledgeable insurance brokers in the world, Aon promised Giant Eagle that, if the need for Directors and Officers ("D&O") coverage ever arose, Aon would provide (a) advice regarding which insurers should be notified of the claim and (b) timely notice of the claim to all insurers. Aon's claims advocacy services did not come cheaply. Giant Eagle had to pay Aon substantial additional fees to no longer worry that timely notice would be given to the right insurer(s) for each new claim.

2.      As an expert in insurance coverage, Aon knew that an insured must provide timely notice of a claim to trigger the insurer's duty to provide coverage for that claim. Aon further knew that, under D&O and other policies that require a claim to be first made and reported during a policy period, the failure to timely report a claim could lead to a forfeiture of coverage.

3.      Despite having such knowledge, a contractual obligation to provide notice, and a

lengthy record of receipt of D&O notices from Giant Eagle, after Giant Eagle informed Aon of the Opioid Lawsuits, Aon failed to satisfy its contract or follow its past procedures, jeopardizing Giant Eagle's right to $40 million in D&O coverage.

4.      From 2014 until 2025, Aon served as Giant Eagle's broker. It secured the placement of Giant Eagle's commercial general liability ("CGL") and D&O insurance policies every year during that period. In 2018, Giant Eagle agreed to pay Aon substantial additional fees to provide claims advocacy services for D&O claims.

5.      Starting in 2018, Giant Eagle was sued in over 30 lawsuits for allegedly contributing to the opioid epidemic. These lawsuits sought billions of dollars in damages. Giant Eagle immediately began looking for any and all insurance coverage that might be available for the potential exposure that came with these lawsuits.

6.      Giant Eagle's urgent need for coverage for the opioid lawsuits could not have been lost on Aon. Giant Eagle made clear to Aon the extraordinary exposure Giant Eagle faced. Aon also knew about such exposure from other customers that, like Giant Eagle, had been targeted in the opioid lawsuits.

7.      When the opioid lawsuits hit, Giant Eagle had just finished negotiating and signing its 2018 engagement letter with Aon (the "Service Agreement") (attached as Exhibit 1 and incorporated herein) through which Aon agreed to provide timely notice for all D&O claims and advice and guidance regarding the insurers and policies that should receive notice of any claim asserted against Giant Eagle.

8.      The Service Agreement further established that Aon was acting as an agent for both Giant Eagle and the Insurers (defined below) for notice purposes, such that notice of a D&O claim to Aon would, in effect, be notice to the Insurers too.

9.      In keeping with the Service Agreement, Giant Eagle asked Aon to put all insurers whose policies might provide coverage on notice of the opioid lawsuits. Though Aon promised to advise Giant Eagle in these situations regarding which insurers and policies should receive notice of a claim, Aon provided no such guidance for the opioid lawsuits. Giant Eagle was forced to make this determination on its own.

10.     To this end, Giant Eagle sent Aon an email listing its CGL and D&O insurers and policies that should receive prompt notice of the opioid lawsuits. This email was sent after a phone call during which Giant Eagle asked Aon to ensure that notice of the opioid lawsuits was provided under all potentially applicable CGL and D&O policies. There was no downside to providing notice.

11.     On September 21, 2018, Aon sent notice of the opioid lawsuits to insurers in Giant Eagle's CGL tower, which included Federal Insurance Company ("Federal"), a subsidiary of Chubb. The notice was sent to Chubb's main claim reporting email address (cscfnol@chubb.com), and not to any of the email addresses listed in the D&O Policy for which another Chubb subsidiary, Westchester Fire Insurance Company ("Westchester" or "Chubb"), is the primary carrier. The notice was not sent to Navigators Insurance Company ("Navigators") or and Argonaut Insurance Company ("Argonaut") (collectively with Chubb, the "Insurers"), who are excess carriers in the D&O tower.

12.     As a result, when Giant Eagle requested D&O coverage for the opioid lawsuits, the Insurers denied their defense and coverage obligations, principally on the basis that notice of the opioid lawsuits had not been sent in accordance with their respective D&O policies.  These denials, which occurred in late June and July 2024, were the first time that Giant Eagle learned that the Insurers did not consider the Aon notice sent in 2018 to be sufficient under their respective policies.

13.     After the Insurers denied coverage due to alleged late notice, Giant Eagle filed a demand for arbitration against them seeking coverage for the opioid lawsuits. The arbitration panel ordered initial Phase I discovery and summary judgment briefing on the issue of whether Giant Eagle provided adequate and timely notice of the opioid lawsuits.

14.     Phase I discovery has been costly to Giant Eagle, which has incurred more than $1 million in litigation costs to date. At the same time, Giant Eagle continues to incur settlement and defense costs in the opioid lawsuits that now exceed the $40 million in combined limits from the D&O policies. If the Insurers prevail on their late notice defense, Giant Eagle will forfeit $40 million in D&O coverage for defense and settlement costs in the opioid lawsuits.

15.     If Aon had provided notice to the Insurers via email addresses listed in their respective policies, the Insurers would not have had any conceivable basis for asserting a late notice defense and, as such, Giant Eagle would not have incurred over $1 million in notice-related litigation costs to date. And, even more important, its $40 million in D&O coverage would not be at risk.

16.     In the D&O arbitration, Giant Eagle has argued (and still believes) that the notice of the opioid lawsuits that Aon sent to Chubb was sufficient even though that notice was not sent directly to one of the email addresses listed in the policy. Giant Eagle also has argued (and still believes) that the Insurers received timely notice of the opioid lawsuits notwithstanding their respective arguments that Aon did not send notice to the addresses listed in their policies. If Giant Eagle prevails on these positions, as to each Insurer, its damages in this lawsuit will include the costs and expense (including attorney fees) of litigating the notice defense, together with punitive damages. If Giant Eagle does not prevail in full, its damages could include not only its costs and expenses (including attorney fees) of the D&O arbitration, but also the amount of D&O coverage

(up to $40 million) forfeited due to Aon's failures described herein, together with punitive damages.

17. For Aon's gross and reckless departure from its professional and contractual obligations, Giant Eagle seeks to recover actual and punitive damages from Aon.

## II. THE PARTIES

18. Plaintiff Giant Eagle, Inc. is a Pennsylvania corporation with its principal place of business at 700 Cranberry Woods Drive, Cranberry Township, PA 16066.

19. Upon information and belief, Defendant Aon Risk Services Central, Inc. is an Illinois corporation with its principal place of business at 200 East Randolph Street, Chicago, IL 60601.

20. Upon information and belief, Defendant Aon Financial Services Group, Inc. is an Illinois corporation with its principal place of business at 801 Adlai Stevenson Drive, Springfield, IL 62703.

## III. JURISDICTION AND VENUE

21. This Court has jurisdiction over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and there is complete diversity between Giant Eagle and Aon.

22. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred within the Western District of Pennsylvania, where Giant Eagle is located.

## IV. FACTUAL BACKGROUND

23. Aon is a leading insurance industry expert regarding (a) the procurement of insurance, (b) insurance coverage, and (c) claims advocacy services. Aon represents itself as an "expert" in all matters relating to insurance and, not surprisingly, specifically marketed itself to

Giant Eagle as an expert in insurance—including claims advocacy. Giant Eagle relied heavily on Aon's promised expertise.

24.    Aon provided Giant Eagle specific assurances that it would bring its decades of experience to bear on Giant Eagle's behalf. Aon claimed that it would exercise its independent professional judgment to advise Giant Eagle with respect to matters within the scope of its engagement. For the additional claims advocacy services purchased by Giant Eagle at an additional cost, Aon promised to identify the insurers and policies to whom notice of the opioid lawsuits should be given and, after consultation with Giant Eagle, provide such notice in a timely and effective manner.

25.    Giant Eagle also knew from Aon's disclaimers that Aon also was contractually obligated to provide similar services to the Insurers. As a result, Aon often serves as a dual agent for its insured and insurer customers. Aon acts as a producer for insurers where, as ultimately happened here, it receives a commission from insurers for the successful solicitation of insurance coverage for them to underwrite. Aon also acts as an insurance broker for customers needing insurance by procuring coverage for them. For the same additional fee charged to Giant Eagle here, Aon also provides claims advocacy services to its insured customers from notice of a claim through final resolution.

26.    As part of its claims advocacy service, Aon promises to provide timely notice of claims against its insured clients, advise insureds regarding which policies might provide coverage, coordinate the claim process, establish lines of communication with insurers, and help insureds pursue coverage from insurers for indemnity and reimbursement of defense costs.

27.    In 2018, Aon's public website boasted to its insured customers like Giant Eagle, "[a]t Aon, we honor our commitments." Those commitments included serving "every client …

6

with a consistent, high-quality, high-value, and engaging experience with every interaction." *See* Exhibit 2, at 2 (The Wayback Machine capture of Aon website from April 11, 2018, accessed June 3, 2026, at https://web.archive.org/web/20180411155053/http://www.aon.com/clientpromise/?aoncom-cp-02).

28.    From 2014 to 2018, Aon negotiated and bound coverage for Giant Eagle under various lines, including CGL and D&O. All communications with Giant Eagle's insurers went through Aon. Throughout this period, Aon always provided notices of claims asserted against Giant Eagle to insurers, including those providing D&O coverage.

29.    In 2018 meetings with Giant Eagle, Aon touted the advantages of its claims advocacy services for an additional fee. Based on these representations, Giant Eagle understood that if it purchased Aon's claims advocacy services, it would be Aon's responsibility (not Giant Eagle's responsibility) to provide notice of claims under Giant Eagle's D&O policies.

30.    Aon further explained to Giant Eagle that notice to Aon also would be notice to Giant Eagle's D&O insurers.

31.    These benefits from Aon's claims advocacy services were critical to Giant Eagle because, in 2018, Giant Eagle underwent corporate restructuring and only one employee, Sarah Nelson, remained in a purely administrative role related to insurance.

32.    Aon and its parent companies recognize both Aon's obligation to provide timely notice of claims for its customers and the potentially severe consequences of failing to do so. For example, Aon's parent corporation Aon PLC, in its SEC 10-K filing from 2018, explains that Aon:

> assist[s] our clients with … related claims … E&O claims against us may allege our potential liability for damages arising from these services. E&O claims could include, for example, the failure of our employees or sub-agents, whether negligently or intentionally, to place coverage correctly or **notify carriers of claims on behalf of clients**.

Exhibit 3, at 13 (Aon PLC 2018 10-K) (emphasis added).

7

A.    The Service Agreement

33.    From 2014 to early 2018, Aon routinely exercised its independent, professional judgment and took the lead in providing timely and adequate notice of claims to Giant Eagle's CGL and D&O insurers. During this time, Aon took the position that it had no contractual obligation to provide notice but did so merely as a courtesy.

34.    During Giant Eagle's 2018 Service Agreement renewal, Aon took the position that it would no longer be responsible for providing notice of claims for Giant Eagle unless Giant Eagle paid an additional fee for Aon's claims advocacy services.

35.    Aon presented Giant Eagle with a draft Service Agreement that gave Giant Eagle two options for "Claim Notification to Insurers" detailed in Exhibit C to the draft. These provisions are reflected in drafts exchanged between the parties.

36.    Under "Option 1," Giant Eagle had "responsibility to take such steps as are necessary to notify directly those insurers" of claims. Additionally, by choosing Option 1, Aon warned Giant Eagle that, "[u]nless [Aon] has a specific signed agreement with [Giant Eagle] to the contrary … the receipt of such notice by [Aon Risk Services] shall not … constitute notice to [Giant Eagle's] insurers." In other words, Option 1 told Giant Eagle that, unless it had a signed agreement from Aon to provide claim notices to Giant Eagle's insurers, Aon's receipt of a claim notice would not constitute notice to the insurer.

> C.    Claim Notification to Insurers
>
> [OPTION 1: Unless ARS has a specific signed agreement with Client to the contrary, it is Client's responsibility to take such steps as are necessary to notify directly those insurers whose FSG Program may apply to any circumstances, occurrences, claims, suits, demands and losses in accordance with the terms and conditions of Client's policies. ARS assumes no duty or responsibility with respect to such notifications or monitoring Client's obligation to place insurers on notice unless undertaken in an amendment or separate written agreement. Client may send copies of such notices to members of ARS staff for informational purposes only, but the receipt of such notice by ARS shall not create additional duties or obligations owed by ARS to Client nor constitute notice to Client's insurers. END OF OPTION 1]

37.    But for an additional fee, Giant Eagle selected Option 2 which did, in fact,

constitute "a specific signed agreement" requiring Aon to provide claim notices to insurers on Giant Eagle's behalf. As a result of this signed agreement, Giant Eagle understood, as confirmed by discussions with Aon, that "receipt of … notice [of a claim] by [Aon] shall … constitute notice to [Giant Eagle's] insurers."  Exhibit 4, at 15 (language from "OPTION 1").

> [OR OPTION 2: Client shall provide ARS with all information relevant to circumstances, occurrences, claims, suits, demands and losses, which occurred under the FSG Program ARS placed under this Agreement, so that ARS may transmit such information to insurer(s) and/or properly assist Client in any negotiations with insurer(s) and adjusters. END OF OPTION 2]

*Id.*

38.     Later emails further confirm that Giant Eagle selected "Option 2," striking out "OPTION 1" in an ensuing draft of the Service Agreement.

> C.     Claim Notification to Insurers
>
> [OPTION 1: Unless ARS has a specific signed agreement with Client to the contrary, it is Client's responsibility to take such steps as are necessary to notify directly those insurers whose FSG Program may apply to any circumstances, occurrences, claims, suits, demands and losses in accordance with the terms and conditions of Client's policies. ARS assumes no duty or responsibility with respect to such notifications or monitoring Client's obligation to place insurers on notice unless undertaken in an amendment or separate written agreement. Client may send copies of such notices to members of ARS staff for informational purposes only, but the receipt of such notice by ARS shall not create additional duties or obligations owed by ARS to Client nor constitute notice to Client's insurers. END OF OPTION 1]
>
> [OR OPTION 2: Client shall provide ARS with all information relevant to circumstances, occurrences, claims, suits, demands and losses, which occurred under the FSG Program ARS placed under this Agreement, so that ARS may transmit such information to insurer(s) and/or properly assist Client in any negotiations with insurer(s) and adjusters. END OF OPTION 2]

February 26, 2018, Redline of Engagement Letter Between Aon Risk Services Central Inc. and Giant Eagle, Inc. (attached as Ex. 4, at 15) (markup showing "OPTION 1" in strikethrough).

39.     When Giant Eagle executed the final version of the Service Agreement, it only contained "OPTION 2" and, as such, Giant Eagle engaged Aon "to perform claims advocacy and claim consulting services related to [Giant Eagle's] Directors and Officers Liability … [for any] claim that occurred during the 04/23/2018 to 04/23/2019 … policy period[]." Ex. 1, at 14.

40.    Giant Eagle understood that, following execution of the Service Agreement, Giant Eagle only had to provide notice to Aon, but that such action would be the functional equivalent of providing notice to the insurance carriers.

41.    Giant Eagle and Aon entered into the Service Agreement on March 6, 2018.

42.    Aon's claims advocacy services did not come cheaply. Under the Service Agreement, Giant Eagle agreed to pay Aon hundreds of thousands of dollars for its expertise in claims advocacy and providing timely notice of claims.

43.    In the Service Agreement, Aon disclosed to Giant Eagle that Aon would "earn and retain all commissions paid to [Aon] by the insurers."

> For the Commission Based Programs listed in Exhibit A, Section 1(B), ARS will earn and retain all commissions paid to Us by the insurers.
>
> In addition to retail commissions, ARS may receive additional forms of compensation from insurers and third parties including but not limited to: contingencies, overrides, bonus commissions, national additional commissions, subscription market brokerage charges, referral fees and/or administrative expense reimbursements. This revenue is in addition to and shall not be credited against the Fee or any other compensation earned hereunder. Additional information is available upon request.

Ex. 1, at 2; *see also* Ex. 4, at 2 (showing Aon added this provision).

44.    After the parties entered into the Service Agreement, it was Aon's obligation to provide timely notice of claims when a new claim was asserted against Giant Eagle.

**B.    Giant Eagle's D&O Coverage**

45.    Aon procured Giant Eagle's 2018-2019 D&O insurance coverage tower.

46.    In 2018, Giant Eagle's D&O insurance coverage tower consisted of a base layer followed by two excess policies. Chubb provided a $20 million base-layer D&O policy (attached as Exhibit 5 and incorporated herein), while Navigators provided the first excess $10 million D&O policy (attached as Exhibit 6 and incorporated herein), with Argonaut providing the final $10 million D&O policy layer (policy attached as Exhibit 7 and incorporated herein).

47.     Giant Eagle's excess D&O insurance policies follow form to the Chubb base-layer policy. The Chubb policy provides coverage for a "Wrongful Act" by Giant Eagle as a Company. Ex. 5, at 13. The policy defines "Wrongful Act" to mean "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by … the Company …." *Id*. at 15.

**C.      Giant Eagle is sued in the opioid lawsuits and instructs Aon to provide notice to its CGL and D&O insurers.**

48.     In June 2018, governmental entities in Ohio sued Giant Eagle and many others for harm allegedly resulting from the opioid epidemic. These lawsuits claimed that Giant Eagle failed to establish proper internal controls over the distribution and dispensing of opioid medications and contributed to the opioid epidemic.

49.     Over the past eight years, Giant Eagle has, without any insurance coverage assistance, successfully defended itself against dozens of baseless opioid lawsuits. Giant Eagle was part of the initial MDL bellwether process and litigated those cases to an extremely favorable settlement of 10 lawsuits involving claims by over 100 Ohio-entity plaintiffs.

50.     Immediately after being sued, and for months thereafter, Giant Eagle turned to and relied on Aon to satisfy its notice requirements under the applicable insurance policies to preserve Giant Eagle's right to pursue coverage for the opioid lawsuits under both its CGL and D&O policy towers. After all, that is precisely what Giant Eagle had paid Aon to do. With this in mind, Giant Eagle promptly notified Aon in writing of the opioid lawsuits, provided Aon with copies of the complaints, and instructed Aon to notify both its CGL and D&O insurers.

51.     Under the Service Agreement, Giant Eagle must timely report claims, suits, damages, and losses to Aon. Ex. 1, at 15. In June of 2018, Giant Eagle did its part by timely forwarding the opioid MDL complaints to Aon as they became available. That process began on

June 12, 2018, when Giant Eagle provided Aon notice of the first two opioid lawsuits. *See* Exhibit 8, at 5 (June 12, 2018, Email to Aon).

52.     Given the billions in potential exposure from the opioid lawsuits, Giant Eagle understandably wanted to preserve its right to pursue coverage from any insurance policy that might provide coverage for the opioid lawsuits. To achieve this goal, Giant Eagle recognized that notice of the opioid lawsuits needed to be given to each insurer under each policy that might provide coverage.

53.     Relying on the client advocacy services it purchased, Giant Eagle asked Aon to put all potential sources of insurance coverage for the opioid lawsuits—including both CGL and D&O insurers—on notice of the claims asserted in those lawsuits.

54.     Ms. Nelson, the lone employee in Giant Eagle's insurance department, relied on Aon to provide proper and timely notice to insurers.

55.     On June 12, 2018, Ms. Nelson asked Aon by email to provide notice of the opioid lawsuits to the base-layer 2017-2018 CGL policies.

56.     The receipt of Giant Eagle's request to provide notice to even a single insurer triggered Aon's contractual and professional duties, as set forth in the Service Agreement and as inherent in a broker's standard of care, to determine which insurers were potentially implicated by the claim. Despite this duty, Aon failed to advise Giant Eagle on *any* policies that may respond to the opioid lawsuits. Instead, in June of 2018, Aon merely honored Ms. Nelson's request by robotically transmitting notice of the opioid lawsuits to Old Republic Insurance Company and XL Specialty Insurance Company even though, at the time, Ms. Nelson did not realize that other policy years were implicated by the allegations in the opioid lawsuits.

57.     Reflecting Giant Eagle's desire to pursue all potential coverages for the opioid

lawsuits—including D&O coverage—Ms. Nelson emailed Aon's Giant Eagle account manager, Colin Murray, along with Ben Popson and Jeff Hall, to request a Law360 article about D&O coverage for the defense of an action related to the distribution of opioids.

58.     Giant Eagle's initial document production in the opioid MDL reflected its intent to provide notice to both its CGL and D&O insurers. The MDL's Case Management Order One, (Case No. 1:17-md-02804-DAP (N.D. Ohio), ECF No. 232), required Giant Eagle to:

> produce any insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment in the Track One Cases, or to indemnify or reimburse for payments made to satisfy any judgment. This includes agreements insuring against general liability, product liability, druggist liability, directors and officers liability, and any other applicable agreements.

Based on this directive, in late summer 2018, Giant Eagle produced both its CGL and D&O insurance policies because, in its view, one or both sets of policies would provide coverage for the opioid lawsuits. Specifically, this production included Giant Eagle's CGL policies from 2008-2019, its D&O policies for the 2018 policy year, and a table Bates-labeled HBC_MDL_00000001 showing what policies Giant Eagle understood "may be liable" to provide coverage for the opioid lawsuits. The excerpt from that table for the 2018-2019 policy year showed both CGL and D&O policies.

| Year/Term | Carrier | Policy Number |
|---|---|---|
| 2018-19 | Old Republic | MWZX 312997 |
| | XL Specialty Insurance | US00074903LI18A |
| | Liberty Insurance Underwriters/Ohio Casualty | ECO1958688930 |
| | Liberty Insurance Underwriters | 1000035354-14 |
| | Great American Insurance Company | EXC 2071066 |
| | Chubb | 9364-42-11 |
| | Chubb | G2512750A 004 |
| | Navigators | PT18DOL309574IV |
| | Argonaut | MLX 7600462-05 |

Exhibit 9, at 2 (insurance policy table) (showing CGL Policy Nos. MWZX 312997;

US00074903LI18A; ECO1958688930; 1000035354-14; EXC 2071066; 9364-42-11 and D&O Policy Nos. G2512750A 004; PT18DOL309574IV; MLX 7600462-05).

59.     On August 29, 2018, Ms. Nelson sent updated information to multiple representatives at Aon and told them to "put all carriers for all layers on notice for all of these [lawsuits] from current term back to 2006." Exhibit 10, at 2 (August 29, 2018, Email to Aon).

60.     Ms. Nelson expected that, based on this instruction, Aon would put Giant Eagle's CGL and D&O carriers on notice of the opioid lawsuits.

61.     In September 2018, representatives from Giant Eagle and Aon participated in a conference call. On the call, the participants discussed, among other things, providing notice to Giant Eagle's CGL and D&O insurers.

62.     Following this call, Giant Eagle sent an email to Aon identifying the insurers that should receive notice of the opioid lawsuits based on a list of insurers Aon should have already noticed. This list included the D&O Insurers. This email reaffirmed what the parties had already discussed on the conference call: Aon needed to notice all insurers, including D&O.

63.     Throughout Giant Eagle's interactions with Aon in the summer of 2018, Michael Wagner ("Mr. Wagner"), an Aon employee who worked on the Giant Eagle account, was on medical disability leave. During his extended six-week absence, Giant Eagle worked on the opioid lawsuit coverage claims with other Aon employees—mainly Jeffrey Hall ("Mr. Hall") and Colin Murray ("Mr. Murray")—the latter of whom was in charge of the Giant Eagle account for Aon.

64.     On September 19, 2018, Giant Eagle and Aon had another call to discuss the opioid lawsuits with attendees from Aon that included Mr. Hall, Mr. Murray, and, for the first time, Mr. Wagner. During this call, the parties recognized the need to provide notice and discussed their previous call as well as "the types of policies" to receive notice, which included the D&O policies.

Giant Eagle did not know it then, but this conference call occurred on the first day Mr. Wagner returned from his medical leave. According to Mr. Wagner's notes from the call, the parties specifically discussed "claims made" notice, which only applied to Giant Eagle's D&O policies—not its CGL policies.

65.    On September 21, 2018, Aon sent notice of the opioid lawsuits to insurers in Giant Eagle's CGL tower, which includes Federal. The notice was sent to Chubb's main claim reporting email address (cscfnol@chubb.com), and not to one of the email addresses listed in the D&O Policy for which Westchester (another Chubb subsidiary) is the primary carrier. The notice was not sent to Navigators or Argonaut.

**D.    The D&O Insurers have a duty to defend the opioid lawsuits.**

66.    Given its vast insurance expertise and contractual promises, Aon had a duty and contractual obligation, upon being informed of a claim against Giant Eagle, to first identify all the policies that provided potential coverage for the opioid lawsuits and then to do whatever was necessary to ensure that proper and timely notice of these claims was given to the Insurers.

67.    The opioid lawsuits plainly fall within the insuring clauses in the D&O policies due to their allegations of "Wrongful Acts" by Giant Eagle. The opioid lawsuit complaints allege that Giant Eagle did not have adequate policies and procedures in place to ensure that only legitimate opioid prescriptions were filled by its pharmacists.

68.    Aon knew, or should have known, that standard D&O policies like Giant Eagle's 2018 D&O policies might provide coverage to corporate defendants like Giant Eagle that had been sued in the opioid lawsuits. In *The North Carolina Mutual Wholesale Drug Company v. Federal Insurance Company*, Case No. 1:22-cv-00553-CCE-JEP, for example, a federal district court found that a drug distributor was entitled to entity liability coverage from Chubb for the opioid lawsuits (Order, ECF No. 34, finding D&O coverage attached as Exhibit 11 and incorporated herein).

15

69.    In Giant Eagle's arbitration against its D&O Insurers seeking coverage for the opioid lawsuits, Chubb's corporate representative admitted what *North Carolina Mutual* makes clear—the Giant Eagle D&O policy potentially provides coverage for the opioid lawsuits. This admission is significant because, under Pennsylvania law, an insurer's duty to defend and reimburse defense costs is triggered even if only one claim is potentially covered.

**E.    The Insurers claim that the 2018 Notice was insufficient.**

70.    Aon knew Giant Eagle's D&O policies with the Insurers were all claims-made policies. As a result, Aon knew that coverage would likely be forfeited if it failed to provide notice of a claim during the policy year when the claim was first asserted.

71.    When Giant Eagle was sued in the opioid lawsuits, Aon was fully aware that there was potential D&O coverage, and Aon's failure to give timely notice under Giant Eagle's D&O policies could result in a loss of D&O coverage.

72.    After instructing Aon to provide notice to its CGL and D&O insurers, Giant Eagle reasonably believed that Aon would fulfill its duties and contractual obligations by ensuring that the opioid lawsuits were properly noticed under all potential coverages and Giant Eagle's claims for insurance coverage were timely preserved.

73.    Giant Eagle's CGL insurers denied coverage for the opioid lawsuits principally on the basis that the lawsuits do not allege damages because of "Bodily Injury." Due to this denial of coverage, Giant Eagle filed two lawsuits against its CGL insurers to vindicate its contractual rights to coverage for the opioid lawsuits.

74.    Given the position of Chubb and Giant Eagle's other CGL insurers that the opioid lawsuits do not involve bodily injury, Giant Eagle's D&O Insurers could no longer credibly rely on the bodily injury exclusion in their policies to deny coverage. For this reason, Giant Eagle began actively pursuing D&O coverage in early 2024. To this end, Giant Eagle' sent a letter to its D&O

16

Insurers on April 10, 2024, formally requesting defense and indemnity for the opioid lawsuits.

75.     On June 27, 2024, Chubb denied D&O coverage to Giant Eagle principally on the basis that the notice requirement of the policy was allegedly not met. Exhibit 12 (June 27, 2024, Chubb denial). Chubb identified the following alleged errors in Aon's notice email:

> Giant Eagle's September 21, 2018 notice was directed solely to its general liability insurers and was titled "New GL Primary and Excess Loss Notice." In addition, the September 21 letter was not sent to the required addresses for notice expressly identified in Item G of the D&O Policy Declarations. Accordingly, the September 21, 2018 letter did not satisfy the reporting requirements outlined above, as it did not provide *any* notice to Chubb that Giant Eagle was making a **Claim** under *any* D&O Policy.

*Id.*, at 6.

76.     On July 16, 2024, Navigators also denied Giant Eagle D&O coverage, claiming that "Giant Eagle's Failure to Timely Report the Opioid Lawsuits to Navigators Precludes It from Obtaining Coverage Under the Navigators D&O Policies." Exhibit 13, at 5 (July 16, 2024, Navigators denial).

77.     On July 31, 2024, Argonaut likewise denied Giant Eagle D&O coverage, claiming that "Giant Eagle's failure to timely report the Opioid Lawsuits to Argonaut precludes coverage for the Opioid Lawsuits under the Argonaut Second Excess Policy." Exhibit 14, at 8 (July 31, 2024, Argonaut denial).

78.     Since then, Giant Eagle has been forced to engage in nearly two years of discovery in an arbitration with the D&O Insurers over the preliminary issue of whether Giant Eagle provided the Insurers with timely notice of the opioid lawsuits. The Insurers insist that Aon failed to provide proper notice under their policies. Unsurprisingly, this hard-fought litigation has cost Giant Eagle more than $1 million in attorneys' fees and related costs to establish that notice was provided.

79.     To date, while defending itself against the underlying opioid lawsuits, Giant Eagle has far exceeded its D&O coverage by incurring over $40 million in legal fees and settlement

payments. Had Aon provided notice to the Insurers in a manner that would have left Insurers with no room to argue that notice was insufficient, Giant Eagle would have avoided costly litigation with the Insurers over whether they received adequate notice, streamlining Giant Eagle's ability to access up to $40 million in D&O coverage and reimbursement of its defense costs in connection with the opioid lawsuits.

## COUNT I
### (Breach of Contract)

80.     Giant Eagle incorporates herein the allegations in paragraphs 1 through 79.

81.     A breach of contract has occurred where (1) a contract exists, (2) defendant breaches a duty imposed by the contract, and (3) there are resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).

82.     For the 2018 policy year, Giant Eagle engaged Aon, pursuant to the Service Agreement, to provide claims advocacy expertise and other professional insurance brokerage services for additional consideration.

83.     Giant Eagle satisfied all its contractual obligations owed under the Service Agreement.

84.     The Service Agreement was in full force and effect at all relevant times.

85.     Relevant here, the Service Agreement required Aon to assess coverage, advise Giant Eagle which insurers should receive notices of the claim and under what policies, and provide timely and adequate notice of the claim to those insurers. Under the Service Agreement, Aon was obligated to provide these services in accordance with the highest professional standards applicable to insurance brokers. Ex. 1, at 14-15; *see also Evanston Ins. Co. v. OPF Enters., LLC*, 826 Fed. Appx. 327, 329-330 (5th Cir. 2020) (broker agreement made broker responsible for immediately providing notice of claims to the insurer).

86. The Service Agreement required Aon to cooperate with and advocate for Giant Eagle when Giant Eagle sought coverage from its insurers for any claim asserted against it. Ex. 1, at 6, 14.

87. Under the Service Agreement, Giant Eagle provided Aon with timely notice of the opioid lawsuits. Ex. 1, at 15; Ex. 8, at 5; Ex. 10.

88. Though it was Aon's contractual obligation under the Service Agreement, Aon provided no advice to Giant Eagle regarding which insurers should receive notice of the opioid lawsuits. As a result, Giant Eagle asked Aon—both in writing and telephonically—to put all insurers (including the D&O Insurers) on notice of the opioid lawsuits. To assist Aon, Giant Eagle gave Aon a list of insurers that should receive notice that included all D&O insurers.

89. Despite acknowledging that notice would be provided to all insurers, Aon sent notice to Chubb in a manner that Chubb claims was not compliant with the D&O Policy.

90. Aon did not send the notice to Navigators or Argonaut.

91. Aon admits that it did not send notice of the opioid lawsuits to any email addresses listed in the Insurers' respective D&O policies.

92. Aon has committed multiple breaches of the Service Agreement. These breaches include, but are not limited to, the following:

(a) Failing to advise Giant Eagle regarding which insurers and policies should receive notice of the opioid lawsuits;

(b) Disregarding Giant Eagle's instructions;

(c) Failing to provide notice to the Insurers in a manner that would foreclose any argument by the Insurers that notice was insufficient, which has cost Giant Eagle over $1 million in legal fees to date;

(d)     Failing to confirm with the Insurers that notice was properly provided under the respective D&O policies;

(e)     Failing to send, and failing to inform Giant Eagle that Aon did not send, notice of the opioid lawsuits to the Excess Insurers; and

(f)     If the Insurers prevail on the notice issue in the D&O arbitration, misrepresenting to Giant Eagle that if it purchased Aon's claims advocacy service, which Giant Eagle did, notice to Aon of a claim would be deemed notice to the D&O insurers.

93.     As a direct result of Aon's multiple breaches of its contractual obligations, Giant Eagle has incurred, and will continue to incur, enormous attorneys' fees and costs litigating whether the D&O insurers received timely notice of the opioid lawsuits. If the Insurers prevail on the notice issue in the D&O arbitration, Giant Eagle will forfeit up to $40 million in D&O coverage for the opioid lawsuits. All these damages from Aon's multiple breaches of the Service Agreement and its professional obligations were reasonably foreseeable.

## COUNT II
### (Professional Negligence)

94.     Giant Eagle incorporates herein the allegations in paragraphs 1 through 93.

95.     Under Pennsylvania law, professional negligence occurs where (1) the defendant owes the plaintiff a duty of care in accordance with the standards of her profession, (2) the defendant fails to meet those professional standards, (3) there is "a causal connection between the conduct and the resulting injury," and (4) the plaintiff suffers actual damage or loss from the breach of those professional standards. *Murphy Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005).

96.     Gross negligence is "conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the consequences of one's actions." *Felecccia v.*

*Lackawanna Coll.*, 215 A.3d 3, 19 (Pa. 2019). Recklessness involves the disregard of a known risk of serious harm from an act or omission.

97.    Aon grossly and recklessly departed from the standards of its profession including by the following misconduct:

(a)    Failing to advise Giant Eagle regarding which insurers and policies should receive notice of the opioid lawsuits;

(b)    Disregarding Giant Eagle's instructions;

(c)    Failing to provide notice to the Insurers in a manner that would foreclose any argument by the Insurers that notice was insufficient, which has cost Giant Eagle over $ 1million in legal fees to date;

(d)    Failing to confirm with the Insurers that notice was properly provided under the respective D&O policies;

(e)    Failing to send, and failing to inform Giant Eagle that Aon did not send, notice of the opioid lawsuits to the Excess Insurers; and

(f)    If the Insurers prevail on the notice issue in the D&O arbitration, misrepresenting to Giant Eagle that, if it purchased Aon's claims advocacy service, which Giant Eagle did, notice to Aon of a claim would be deemed notice to the D&O insurers.

98.    Even absent instructions from Giant Eagle, Aon had an unflagging duty and obligation to advise Giant Eagle to put its D&O Insurers on notice of the opioid lawsuits given the massive exposure from these lawsuits and the lack of any significant downside to providing notice to preserve Giant Eagle's right to pursue D&O coverage at a later date. But Aon failed to assess which policies were potentially implicated by the opioid lawsuits or to act on this analysis. Long after Giant Eagle directed Aon regarding the policies that provide potential coverage, the Insurers

21

claimed that Aon's efforts to provide notice, if any, were not sufficient and denied coverage.

99.     Where, as here, an insurance broker promises to provide notice to an insurer, the broker must execute that duty with reasonable care. *Paro Mgmt. Co. v. Willis of N.J., Inc.*, 2025 U.S. App. LEXIS 29289, at *8-10 (2d Cir. Nov. 5, 2025). Aon owed Giant Eagle a duty to exercise reasonable care, skill, and diligence in procuring insurance and servicing the account. *Al's Cafe v. Sanders Ins. Agency*, 820 A.2d 745, 749-50 (Pa. Super. 2003); *see also Saracinaj v. Nationwide Ins. Co.*, 2022 U.S. Dist. LEXIS 3893, at *14-15 (M.D. Pa. Jan. 7, 2022).

100.     By any measure, Aon's failures were not merely negligent, but rather, constitute gross negligence and/or extreme recklessness because Aon knew that notifying the insurers of claims "as soon as practicable" was a condition precedent to coverage under the D&O policies.

101.     Given its professional expertise, Aon was keenly aware of the potentially catastrophic consequences of failing to provide timely notice under a claims-made policy where, as here, the potential exposure from the claim is enormous. As Aon's parent company has acknowledged in its SEC filings, Aon can be subject to errors and omissions claims for the "failure of our employees or sub-agents, whether negligently or intentionally, to … notify carriers of claims on behalf of clients." Aon is now liable for Giant Eagle's potential loss of D&O coverage due to its gross negligence and recklessness in failing to provide unimpeachable notice to Giant Eagle's Insurers of the opioid lawsuits.

102.     Aon's gross negligence and/or recklessness in carrying out its professional duties to Giant Eagle has put $40 million in D&O coverage for Giant Eagle in jeopardy while also causing Giant Eagle to expend huge sums unnecessarily litigating what should have never become a litigable issue. In addition to these damages, by ignoring Giant Eagle's rights and shirking its duties, Aon's actions rise at least to the level of a reckless indifference, justifying an award of

punitive damages.

## COUNT III
### (Negligent Misrepresentation)

103.    Giant Eagle incorporates herein the allegations in paragraphs 1 through 102.

104.    Aon owed a duty to Giant Eagle to provide claims advocacy services to Giant Eagle; following receipt of a coverage claim from Giant Eagle, Aon had a duty to identify potentially responsive insurance policies and accept and/or provide notice. Aon also had a duty to do so in a manner such that insurers would not be able to assert any successful defense that notice was not properly given.

105.    Giant Eagle had a right to rely on the representations made by its professional insurance broker—Aon. This is especially true where, due to Giant Eagle's corporate restructuring of its insurance department, Aon: (1) represented that it would assume responsibility for all D&O claim notification services in exchange for a substantial fee and (2) represented that receipt of notice of a claim from Giant Eagle would constitute notice of that claim to Giant Eagle's insurers.

106.    While Giant Eagle maintains that the Insurers received appropriate notice of the Opioid Lawsuits, if the Insurers win on their argument that the Aon notice was insufficient, that would show that Aon's representations to Giant Eagle regarding timely notice of D&O claims were false.

107.    Giant Eagle reasonably relied on Aon's representations, given Aon's professional expertise.

108.    Aon's representations were material to Giant Eagle. Aon knew these representations were material to Giant Eagle and that Giant Eagle would reasonably rely upon them.

109.    If the Insurers succeed on their notice defense in the D&O arbitration, that would

23

show that in 2018 Aon knew, or should have known, that its representations to Giant Eagle relating to claim notices were false. Further, should the Insurers succeed, it would be due, at least in part, to Aon's negligent misrepresentations, as well as Aon's supportive testimony in the D&O arbitration. Contrary to its statements in 2018 to Giant Eagle, Aon's corporate witnesses stated *the exact opposite* in the D&O arbitration. In the D&O arbitration, Aon claimed for the first time that (1) notice to Aon was *not* notice to the Insurers and (2) it never promised Giant Eagle it would provide notice to the Insurers.  This conduct far exceeds gross negligence and is outrageous in the extreme, justifying an award of punitive damages.

110.   Should the Insurers succeed on their notice defense in the D&O arbitration, Giant Eagle will have suffered severe damages as a direct and proximate result of Aon's negligent and/or intentional misrepresentations, including actual damages exceeding $1 million and additional potential damages of up to $40 million plus interest.

## COUNT IV
### (Fraudulent Misrepresentation)

111.   Giant Eagle incorporates herein the allegations in paragraphs 1 through 110.

112.   If the Insurers prevail on their notice defense in the D&O arbitration, Aon will have necessarily and knowingly misrepresented to Giant Eagle that Aon's receipt of notice of a claim from Giant Eagle would constitute notice of that claim to Giant Eagle's insurers.

113.   If the Insurers prevail on their notice defense in the D&O arbitration, Aon will also have knowingly misrepresented to Giant Eagle that it would provide timely notice of the opioid lawsuits to all Giant Eagle insurers—including its D&O insurers—and that such notice would be provided in a manner such that insurers would not be able to assert any successful defense that notice was not properly given.

114.   Aon knew these representations were material to Giant Eagle and that Giant Eagle

would reasonably rely upon them. Due to corporate restructuring of its insurance department, Giant Eagle purchased expensive claims notification services from Aon to ensure that Giant Eagle only had to give information about any potentially covered claim to Aon, which then had to ensure that proper and timely notice of that claim was given to the appropriate insurers.

115.    If the Insurers succeed on their notice defense in D&O arbitration, that would show that in 2018 Aon knew, or should have known, that its representations relating to claim notices to Giant Eagle were false. Further, should the Insurers succeed, it would be due, at least in part, to Aon's fraudulent misrepresentations, as well as Aon's supportive testimony in the D&O arbitration. Contrary to its statements in 2018 to Giant Eagle, Aon's corporate witnesses stated *the exact opposite* in the D&O arbitration. In the D&O arbitration, Aon claimed for the first time that (1) notice to Aon was *not* notice to the Insurers and (2) it never promised Giant Eagle it would provide notice to the Insurers. Aon's conduct far exceeds gross negligence and is outrageous in the extreme, justifying an award of punitive damages.

116.    Should the Insurers succeed on their notice defense in the D&O arbitration, Giant Eagle will have suffered severe damages as a direct and proximate result of Aon's fraudulent misrepresentations, including actual damages exceeding $1 million and additional potential damages of up to $40 million plus interest.

## V.    PRAYER FOR RELIEF

As a result of Aon's false representations and multiple breaches of its professional and contractual obligations, Giant Eagle is entitled to the following relief:

(a)    An award of compensatory damages for the actual or potential loss of $40 million in D&O coverage;

(b)    An award of compensatory damages in the amount exceeding $1 million (increasing every day) for the attorney fees and expenses incurred by Giant Eagle

in litigating the notice issue in its D&O coverage arbitration;

(c)     Punitive damages for Aon's reckless disregard of the risk of harm to Giant Eagle, gross negligence and incompetence, recklessness, outrageous professional misconduct, and calculated mendacity; and

(d)     Interest and attorneys' fees, and such other relief as the Court deems just proper.

WHEREFORE, Giant Eagle respectfully requests that this Court enter judgment in its favor and against Aon, and order Aon to pay actual damages, punitive damages, and any other relief the Court deems just and proper.

Date: June 17, 2026                                    Respectfully submitted,

*/s/ Scott D. Livingston*
Scott D. Livingston, Esq. (PA ID No. 60649)
Email: livingston@marcus-shapira.com
Matthew R. Mazgaj, Esq. (PA ID No. 327068)
Email: mazgaj@marcus-shapira.com
MARCUS & SHAPIRA LLP
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219-6401
Telephone: 412-471-3490
Facsimile: 412-391-8758

*Counsel for Plaintiff Giant Eagle, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2026, a true and correct copy of the foregoing was electronically filed and served via operation of the Court's CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record entitled to notice who are registered users of ECF.

/s/ Scott D. Livingston
Scott D. Livingston, Esq.